FILED: FEBRUARY 19, 2009
09CV1056
JUDGE ST. EVE
MAGISTRATE JUDGE KEYS
BR

**In The United States District Court**
**For The Northern District Of Illinois**
**Eastern Division**

| | |
|---|---|
| Commodity Futures Trading Commission,<br>Plaintiff,<br><br>vs.<br><br>John M. Marshall, Stephen Z. Adams,<br>Brookshire Raw Materials Group, Inc.<br>Brookshire and Company, Ltd. and<br>Brookshire Raw Materials Management,<br>LLC,<br><br>Defendants and<br><br>Brookshire Raw Materials Group Trust<br>Relief Defendant. | Civil Action No:<br><br>Complaint For Injunctive And<br>Other Equitable Relief And<br>Civil Monetary Penalties Under<br>The Commodity Exchange Act |

## I. Summary

1.      From at least September 2006 to the present ("relevant period"), John M.
Marshall ("Marshall"), Stephen Z. Adams ("Adams"), Brookshire Raw Materials Management,
LLC ("BRM"), Brookshire Raw Materials Group, Inc. ("BRMG") and Brookshire and
Company, Ltd. ("BCL") have solicited and/or accepted customer funds for use in trading in
commodity futures in a commodity pool entitled Brookshire Raw Materials Group Trust
("BRMGT") ("the Trust" or "the pool").  They have misappropriated at least $4.6 million of
those funds and have issued false statements to at least four pool participants that did not disclose
their unauthorized withdrawal of funds from the Trust.  At least one of the pool participants has
been trying to withdraw his funds from the pool since October 2008, without success.  Three
other investors requested redemption of their interests in the Trust in December 2008 and have
not received any of their funds, or any acknowledgement of their redemption requests.

Meanwhile, Marshall and Adams have stopped returning investor phone calls, have cleaned out their Canadian offices and caused computer hard drives in that office to be wiped clean of any data.

2.      Specifically, BRM, Marshall, Adams, BRMG and BCL (collectively "the Defendants") have engaged, are engaging, or are about to engage in acts or practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2006), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651. Defendants have violated Sections 4b, 4n(3)(A) and 4o(1) of the Act, 7 U.S.C. §§ 6b, 6n(3)(A) and 6o(1) (2006), Section 4b of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b, and Commission Regulations 1.31 and 4.7(b)(4), 17 C.F.R. §§ 1.31 and 4.7(b)(4)(2008), by misappropriating pool participants' funds, failing to return requested funds, making false statements to at least one pool participant in connection with commodity futures transactions and destroying, removing and failing to produce required records relating to the Trust.

3.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices, as more fully described below.

4.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), the Commodity Futures Trading Commission ("Commission" or "CFTC") brings this action to enjoin such acts and practices, prevent the dissipation of assets, and compel compliance with the provisions of the Act. In addition, the Commission seeks civil penalties, an accounting, restitution, rescission, disgorgement and such other equitable relief as the Court may deem necessary or appropriate under the circumstances.

## II. Jurisdiction and Venue

5.      This Court has jurisdiction over this action pursuant to Section 6c of the Act,

7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any

person whenever it shall appear to the Commission that such person has engaged, is engaging, or

is about to engage in any act or practice constituting a violation of any provision of the Act or

any rule, regulation or order thereunder.

6.      Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C.

§ 13a-1(e) (2006), in that the Defendants are found in, inhabit, and transact business in this

District, and/or the acts and practices in violation of the Act have occurred, are occurring, or are

about to occur within this District.

## III. The Parties and Other Relevant Entities

7.      Plaintiff <u>Commission</u> is an independent federal regulatory agency that is charged

with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et*

*seq.* (2006), and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2008).

8.      Defendant <u>BRM</u> is a Delaware limited liability company with a main business

office at 1000 Hart Road, Suite 210, Barrington, Illinois 60010 and a branch business office

located at 219 Dufferin St., Suite 300-A, Toronto, Ontario, Canada.  BRM is the managing

owner of the Trust, as well as the commodity pool operator ("CPO") and commodity trading

advisor ("CTA") to the Trust and is registered as such with the Commission.  It is also a member

of the National Futures Association ("NFA").  It is charged with managing the Trust and

directing its trading activities.  It is also responsible for preparing monthly and annual reports to

the pool participants as required by the CFTC, and the NFA.  Under Commission Regulation 4.7,

17 C.F.R. § 4.7 (2008), BRM has been granted an exemption from certain requirements

applicable to CPOs under Part 4 of the Commission's Regulations because it stated that it offered participation in the Trust only to certain qualified eligible persons who meet required income or net worth requirements.

9.     Defendant <u>Marshall</u> is 47 years old and resides in Ontario, Canada. He is the Chief Executive Officer, a Manager, and the Chairman of the Board of BRM and has been approved as a Principal of BRM by the NFA since December 19, 2006.

10.     Defendant <u>Adams</u> is 52 years old and resides in Ontario, Canada. He is the Chief Financial Officer of BRM and was a member of the Board of Managers from October 2005 until April 2007. He owns a 10% or more interest in BRM. The NFA approved him as a Principal of BRM on November 30, 2006. He is a licensed, chartered accountant in the province of Ontario.

11.     Defendant <u>BRMG</u> is an Ontario, Canada incorporated company of which BRM is a wholly owned subsidiary. BRMG developed the Brookshire International Raw Materials Index ("BIRMI"), in which the Trust was invested. The BIRMI is an index "notionally" composed of 26 commodity futures and forward contracts in products ranging from metals and minerals to energy and agricultural products. Marshall is the Chief Executive Officer and a Director of BRMG. Adams is the Chief Financial Officer and a Director of BRMG. The NFA granted approval for BRMG to be a Principal of BRM on November 7, 2005. BRMG owns a 10% or more interest in BRM.

12.     Defendant <u>BCL</u> is an Ontario Canada incorporated company and is the parent company of BRMG. Marshall is the President, Chief Executive Officer, and a Director of BCL. Adams is the Chief Financial Officer. The NFA granted approval for BCL to be a Principal of BRM on November 7, 2005. BCL owns a 10% or more interest in BRM.

13.     Relief Defendant <u>BRMGT</u> (the "Trust"), is commodity pool organized in five separate series, or Funds, as a Delaware statutory trust. The Trust's principal office is at 1000 Hart Road, Suite 210, Barrington, Illinois 60010. The Trust funded its trading account to begin trading commodity futures on September 6, 2006. The Trust is governed by a Private Placement Memorandum ("PPM"), which states that each Fund will invest customer proceeds in a portfolio of commodity futures and forward contracts designed to approximately replicate the investment methodology of corresponding proprietary indices developed and managed by BRMG. According to the PPM, assets of each Fund not required to satisfy margin requirements are to be invested in government treasury securities and other high credit quality short-term fixed income securities, cash and cash equivalents

## IV. Facts

A.     <u>Statutory and Regulatory Background.</u>

14.     The NFA is a registered futures association pursuant to Section 17 of the Act, 7 U.S.C. § 21 (2006).

15.     A "commodity pool" is defined in Commission Regulation 4.10(d)(1), 17 C.F.R. § 4.10(d)(1) (2008), as any investment trust, syndicate or similar form of enterprise engaged in the business of investing its pooled funds in trading commodity futures and/or commodity options.

16.     A "commodity pool operator" is defined in Section 1a(5) of the Act, 7 U.S.C. § 1(a)(5) (2006), as any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property, either directly or through capital

contributions, the sale of stock or other forms of securities or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market.

17.     A "participant" is defined in Commission Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2006), as any person who has any direct financial interest in a commodity pool.

B.     BRM, Marshall and Adams Have Misappropriated Trust Assets and Sent False Statements to Pool Participants.

18.     Since the Defendants began operating the Trust in September 2006, they have attracted at least 11 investors to invest their money for the purpose of trading commodity futures contracts. Under the PPM, the minimum initial investment in the Trust is $500,000. The highest reported value of the Trust was $9.1 million in June 2008. An internal BRM document shows that the Trust purportedly had approximately $4.2 million and Can$378,119 under management as of November 7, 2008.

19.     Under the PPM, Trust assets are to be held in custodial accounts at HSBC in New York, NY or in a futures commission merchant(s) ("FCM(s)") account(s) for trading.

20.     As of December 31, 2008, the HSBC accounts held a total of $11,198. No funds have been deposited since that date.

21.     On information and belief, the Trust had only one trading account at one FCM. Between September 2006 and December 2008, the Trust transferred approximately $2.427 million to the FCM and made approximately $340,000 in trading futures in various foreign currencies. A total of approximately $2.79 million was withdrawn from the FCM account and transferred to the HSBC account during this time as well. The FCM account held $28,209.25 on December 19, 2008 and has received no new deposits.

22.     Marshall and Adams had joint signatory authority over the custodial accounts that hold or held the Trust's assets and were the only people authorized to withdraw funds from these

accounts. Because the accounts required joint signatures for any withdrawals, all withdrawals from the Trust accounts could only be done under the signatures of both Marshall and Adams.

23.     Between September 2006 and October 2008, BRM has withdrawn at least $5,099,095 from HSBC and has wired these funds to bank accounts in Canada, mostly in the care of Marshall. However, pool expenses and management fees totaled only $401,708 for the period September 2006 to October 2008. Under the PPM, the only authorized withdrawals from the Trust are for fees and expenses and pool participant redemptions. Therefore, BRM, Marshall and Adams have misappropriated over $4.6 million from the Trust and the pool participants.

24.     At least three pool participants received monthly pool statements for the period September 2006 through October 2008 that purportedly reflected the assets and liabilities of the overall Trust. These statements were false because they did not disclose the $5,099,095 BRM withdrew from Trust bank accounts.

25.     BRM also issued or caused to be issued monthly pool participant statements to pool participants that reflected each individual pool participant's change in the value of their account, the NAV per unit and the number of units owned. Because the BRM withdrawals were not properly reported on the monthly pool statements and pool expenses affect the NAV of the pool, the individual pool participant statements issued to pool participants beginning in March 2007 are materially false. Moreover, for at least the time period December 2007 through May 2008, the pool participant statements are also false because there were insufficient funds in the Trust's bank and trading accounts to cover the investors' alleged units in the pool.

26.     Adams approved all pool statements and pool participant statements before they were distributed. On information and belief, he also signed each pool statement, under an affirmation that stated that the information in the statement was accurate and complete.

C.    BRM, Marshall and Adams Have Failed to Redeem Pool Participants' Interests in the Trust.

27.    According to the PPM, pool participants who own units in one of the Funds included in the Trust can redeem those units, in whole or part, on any business day. Payment of redemption proceeds are to be made as soon as possible and normally within 10 business days.

28.    On March 16, 2007, customer AK invested $500,000 with the Trust.

29.    AK's account showed an increasing value from the account's inception through June 30, 2008. As of August 31, 2008, the value of his account had fallen from its high, but his pool statements still showed a value of $747,305.07. In September 2008, he successfully withdrew $415,413.73 from his account.

30.    On October 16, 2008, AK sent a redemption request to BRM seeking to redeem three quarters of his remaining investment in the Trust. He requested that the proceeds be wired to his bank account as soon as possible and asked for confirmation of his redemption request by email.

31.    AK received a written response from the Controller of BRM and BRMG the same day acknowledging receipt of his redemption request and stating that the proceeds of the redemption would be wired to AK per his instructions. AK did not receive payment of his redemption request within 10 days, as the PPM instructed.

32.    AK received an account statement from BRM, showing that as of October 31, 2008 his October 16, 2008 redemption request had been honored. The account statement gave a liquidating value for the redemption in the amount of $173,638.50. This statement was false because AK had not received $173,683.50, or any amount in response to his October 16, 2008 redemption request. On information and belief, the statement is also false because the Trust did

8

not hold $173,000 in assets on October 31, 2008 due to BRM, Marshall and Adams' misappropriation.

33.     On or about November 6, 2008, AK asked Marshall about the status of his October 16, 2008 redemption request. Marshall told AK that he would take care of it the following day. AK's redemption request was not honored on November 7, 2008.

34.     After several unanswered phone calls to BRM between November 7, 2008 and November 17, 2008, Adams finally returned AK's calls on November 18, 2008. Adams told AK that he and his partner were trying to obtain more funds so BRM could honor AK's redemption request. Adams also told him that BRM would fully satisfy his redemption request when a certificate of deposit matured on December 1, 2008. The Trust accounts did not hold a certificate of deposit maturing on December 1, 2008.

35.     On November 24, 2008, AK wrote the Controller of BRM and BRMG again, copying Marshall and Adams, and requested a redemption of his remaining interest in the Trust, which the October 31, 2008 statement valued at $43,844. He also requested confirmation of his request and a trade confirmation.

36.     AK has not received payment for either his October or November redemption requests, or any acknowledgment of his requests.

37.     On or about September 1, 2006, KT, on behalf of three investors for which he acted, invested or caused to be invested a total of $3.5 million in the Trust.

38.     On December 2, 2008, KT sent or caused to be sent a written request to BRM and BRMG requesting immediate redemption of all ownership interests held by these three investors in the Trust. Based on information obtained directly from BRM's and BRMG's website that same day, KT understood that the total NAV of the three investors' units in the Trust to be

$2,308,538.65. At about the same time, the Trust held only about $40,000 in bank and trading accounts.

39.     To date, neither BRM nor BRMG have acknowledged KT's redemption requests, nor have they redeemed any of the three investors' units in the Trust.

D.     Pool Records Have Disappeared and Marshall and Adams Have Provided No Satisfactory Explanation for the Failure to Redeem Pool Participants' Interests in the Trust.

40.     On November 13, 2008, Marshall stated in an email to two other principals of BRM that the Trust was "not working" and that the "best course of action" would be to "shut the fund down and close" the Trust. He claimed "we" would be sending out closing documents the next day to notify the investors and stated that "we" have already notified the NFA.

41.     AK and KT have not received any documents notifying them that the Trust is or has closed. The NFA has received no such notification either.

42.     On December 5, 2008, Marshall advised BRM's General Counsel that BRM's office was closing, effective that day. He also advised that all pool assets had been converted to cash and that Adams was completing redemption instructions. On December 5, Adams also told the General Counsel that he had sent redemption requests to the bank that acts as the custodian of the Trust, directing it to distribute all of the Trust's assets to its participants. Upon learning of the Trust's winding down, the General Counsel tendered his resignation from BRM.

43.     The General Counsel asked Adams to provide him and two other principals of BRM with copies of these redemption instructions together with a bank statement from the custodian setting out the Trust's bank balance. To date, none of these individuals have received this information.

44     On December 10, 2008, the General Counsel asked Adams if the Trust's assets had "gone missing." Adams told the General Counsel that the problem was one of "liquidity"

and that he would be acknowledging the redemption requests received from unit-holders and would be calculating the final NAV of the Trust for redemption purposes. Adams told the General Counsel that the funds still existed but they had been removed from the custodial escrow account. He refused to give the General Counsel any more details, stating that he did not want to get the General Counsel involved.

45. On December 5, and December 10, 2008, the General Counsel entered BRM's Toronto office to clear out his possessions. At that time, he observed two employees packing up their desks. On December 10, he helped Adams pack up records that related to various Brookshire companies, which Adams removed from the premises. Meanwhile, that day, the General Counsel took records with him related to the Trust.

46. On December 5, 2008, at Adams' request, a computer consultant who provided computer services to BRM wiped the domain controller server and Microsoft exchange server that contained CPO records clean of all data.

47. On January 8, 2009, the Commission wrote BRM at its main business office in Barrington, Illinois requesting among other things, records it was required to keep under Commission Regulation 4.7(b)(4), including all books and records prepared in connection with its activities as the CPO of an exempt pool .

48. BRM has not provided the requested books and records to the Commission.

49. BRM is unable to produce the requested records because they were not kept in the main business office in Barrington. These books and records were instead kept in the BRM branch office in Toronto, Canada, until December 2008 when the required books and records were removed from the Toronto office and/or destroyed.

## V.  Violations of the Commodity Exchange Act
## and Commission Regulations

### Count I
### Violations of Section 4b of the Act
### Fraud by Misappropriation and Misrepresentation

50.    The allegations set forth in paragraphs 1 through 49 are re-alleged and
incorporated herein.

51.    From at least March 2007 to the present, Marshall, Adams and BRM cheated or
defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool
participants by failing to disclose Marshall's and Adams' fraudulent withdrawal of funds from
the pool and by misappropriating pool funds entrusted to Marshall, Adams and BRM for trading
commodity futures.

52.    Marshall, Adams and BRM also cheated or defrauded or attempted to cheat or
defraud pool participants by willfully making or causing to be made false reports and false
statements to at least four pool participants who invested money with BRM to trade commodity
futures contracts.

53.    With respect to conduct occurring before June 18, 2008, Marshall, Adams and
BRM engaged in this conduct in or in connection with orders to make, or the making of,
contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of
such other persons where such contracts for future delivery were or may have been used for (a)
hedging any transaction in interstate commerce in such commodity, or the products or
byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce
in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate
commerce for the fulfillment thereof.

54.     With respect to conduct occurring on or after June 18, 2008, Marshall, Adams and BRM engaged in this conduct in or in connection with orders to make, or the making of, contracts of sale of commodities in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person.

55.     Marshall, Adams and BRM therefore:  (a) violated Sections 4b(a)(1)(A), (B) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B) and (C), for conduct occurring on or after June 18, 2008; and (b) violated Sections 4b(a)(2)(i), (ii) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii) (2006), the relevant pre-CRA precursors to Sections 4b(a)(1)(A), (B) and (C) of the Act as amended by the CRA, for conduct occurring before June 18, 2008.

56.     The actions and omissions of Marshall and Adams described in this count were done within the scope of their employment or office with BRM, BRMG and BCL.  Therefore, BRM, BRMG and BCL are also liable for Marshall's and Adam's violations of Section 4b of the Act and Section 4b of the Act as amended by the CRA, pursuant to Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2a(1)(B) (2006).

57.     Marshall and Adams, directly or indirectly, controlled BRM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting BRM's violations alleged in this count.  Marshall and Adams are thereby each liable for BRM's violations of Section 4b of the Act and Section 4b of the Act as amended by the CRA, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

58.     Each act of misappropriation, each material misrepresentation or omission, and each false report or statement made during the relevant period, including but not limited to those

specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(i)-
(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18,
2008, and Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7
U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008.

Count II
Violations of Section 4$\underline{o}$(1) of the Act:
Commodity Pool Fraud

59.     Paragraphs 1 through 58 are realleged and incorporated herein.

60.     During the relevant period, BRM acted as a CPO in that it engaged in a business
that is of the nature of an investment trust, syndicate, or similar form of enterprise and in
connection therewith, has solicited, accepted or received funds, securities or property from others
for the purpose of trading commodities for future delivery on or subject to the rules of a contract
market or derivatives transaction execution facility.

61.     From at least March 2007 through the present, BRM violated Section 4$\underline{o}$(1) of the
Act, 7 U.S.C. § 6$\underline{o}$(1) (2006), in that it directly or indirectly employed or is employing a device,
scheme, or artifice to defraud commodity pool participants, or has engaged or is engaging in
transactions, practices or a course of business which operated as a fraud or deceit upon
commodity pool participants by means of the acts and practices described in paragraphs 18
through 46.

62.     In connection with such conduct, BRM used or is using the mails and other means
or instrumentalities of interstate commerce, directly or indirectly, to engage in business as a
CPO.

63.     Marshall and Adams, directly or indirectly, controlled BRM and did not act in
good faith or knowingly induced, directly or indirectly, the acts constituting BRM's violations

alleged in this count. Marshall and Adams are thereby each liable for BRM's violations of

Section 4o(1), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

64.     Each act of misappropriating pool funds and making false reports or false

statements that occurred during the relevant period, including but not limited to those specifically

alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C.

§ 6o(1) (2006).

**Count III**
**Violation Of Section 4n(3)(A) of the Act and**
**Commission Regulations 1.31 and 4.7(b)(4)**
**Failure To Maintain and Produce Books and Records**

65.     Paragraphs 1 through 64 are realleged and incorporated herein.

66.     Section 4n(3)(A) of the Act requires that every registered CPO maintain books

and records as prescribed by the Commission and make them available for inspection upon the

Commission's request. Commission Regulation 1.31, in relevant part, requires that all books and

records required to be maintained or kept by the Act or Commission Regulations shall be kept

for a period of five years and copies or originals shall be provided promptly to a Commission

representative upon request. Commission Regulations 4.7(b)(4) specifies the books and records

that a CPO exempt under Regulation 4.7 is required to keep and maintain at its main business

offices in accordance with Commission Regulation 1.31.

67.     BRM violated Section 4n(3)(A) of the Act, 7 U.S.C. § 6n(3)(A) (2006), and

Commission Regulations 1.31 and 4.7(b)(4), 17 C.F.R. §§ 1.31 and 4.7(b)(4) (2008), because it

failed to maintain, keep and produce to the Commission's representative books and records

prepared in connection with its activities as a CPO of an pool exempt under Regulation 4.7,

among other things.

15

68.     Marshall and Adams, directly or indirectly, controlled BRM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting BRM's violations alleged in this count. Marshall and Adams are thereby liable for BRM's violations of Section 4n(3)(A) of the Act and Commission Regulations 1.31 and 4.7(b)(4), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

69.     Each failure to maintain and make available to the Commission required CPO records made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4n(3)(A) of the Act and Regulations 1.31 and 4.7(b)(4), 7U.S.C. § 6n(3)(A), 17 C.F.R. §§ 1.31, 4.7(b)(4).

## Count IV
## Disgorgement of Funds from Relief Defendant

70.     Paragraphs 1 through 69 are realleged and incorporated herein.

71.     The Defendants have engaged in a fraudulent scheme that defrauded the Trust's participants.

72.     The Trust has received funds that were obtained as a result of the Defendants' fraud.

73.     The Trust has no legitimate entitlement to, or interest in the funds received from the Defendants' conduct.

74.     The Trust should be required to disgorge the funds that it received from the Defendants' fraudulent conduct, or the value of those funds it may have subsequently transferred to third parties.

75.     By reason of the foregoing, the Trust holds funds in constructive trust for the benefit of its participants, who were victimized by the Defendants' fraud.

16

## VI. Relief Requested

WHEREFORE, the Commission respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers:

A.     Enter orders finding: Defendants liable for violating Sections 4b(a)(2)(i)-(iii) of

the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008,

and for violating Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7

U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008; and BRM,

Marshall and Adams liable for violating Sections 4n(3)(A) and 4o(1) of the Act, 7 U.S.C.

§§ 6n(3)(A) and 6o(1) (2006), and Commission Regulations 1.31 and 4.7(b)(4)23, 17 C.F.R. §§

1.31 and 4.7(b)(4);

B.     Enter orders of permanent injunction prohibiting Defendants, and any other person

or entity associated with them, from engaging in conduct violative of the Sections of the Act,

Sections of the Act as amended by the CRA, and/or Commission Regulations that they have been

alleged to have violated;

C.     Enter orders of preliminary and permanent injunction enjoining Defendants and

all persons insofar as they are acting in the capacity of their agents, servants, employees,

successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or

participation with them who receive actual notice of such order by personal service or otherwise,

from engaging, directly or indirectly, in any activity related to trading in any commodity, as that

term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including

but not limited to, the following:

> 1.     Trading on or subject to the rules of any registered entity, as that term is
>        defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2. Engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3. Soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest;

4. Entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf;

5. Engaging in any business activities related to commodity interest trading; and

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008);

D. Enter an *ex parte* order pursuant to Section 6c(a) of the Act restraining

Defendants and all persons insofar as they are acting in the capacity of Defendants' agents,

servants, successors, employees, assigns, and attorneys, and all persons insofar as they are acting

in active concert or participation with them who receive actual notice of such order by personal

service or otherwise, from directly or indirectly:

1. Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants or the Relief Defendant, wherever located, including all such records concerning Defendants' and the Relief Defendant's business operations;

2. Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants or the Trust's, wherever located, including all such records concerning Defendants' and the Relief Defendant's business operations; and

18

3.  Withdrawing, transferring, removing, dissipating, concealing or disposing of, in any manner, any funds, assets, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control, or in the name of the Defendants or the Relief Defendant's;

E.  Enter an order directing that Defendants and the Relief Defendant provide the Plaintiff immediate and continuing access to their books and records, make an accounting to the Court of all of Defendants' and the Relief Defendant's assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity futures transactions or purported commodity futures transactions, including the names, addresses and telephone numbers of any such persons from whom they received such funds from September 2006 to the date of such accounting, and all disbursements for any purpose whatsoever of funds received from commodity investors, including salaries, commissions, fees, loans and other disbursements of money and property of any kind, from September 2006 to and including the date of such accounting At a minimum, the accounting should include a chronological schedule of all cash receipts and cash disbursements. In addition, each transaction shall be classified as business or personal. All business transactions shall disclose the business purpose of the transaction. The accounting shall be provided in an electronic format such as Quicken, Excel, or other accounting or electronic format spreadsheet. In addition, the Defendants and the Relief Defendant shall supply true and accurate copies of any balance sheets, income statements, statement of cash flow, or statement of ownership equity previously prepared for the Defendants' and Relief Defendant's business(es);

F.  Enter an order requiring Defendants immediately to identify and provide an accounting in the same manner as described above, for all assets and property that they currently maintain outside the United States, including, but not limited to, all funds on deposit in any

financial institution, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in the name of John M. Marshall, Stephen Z. Adams, Brookshire Raw Materials Group, Inc. Brookshire and Company, Ltd., Brookshire Raw Materials Management, LLC and Brookshire Raw Materials Group Trust, or their nominees, whether held jointly or otherwise, and requiring them to repatriate all funds held in such accounts by paying them to the Clerk of the Court, or as otherwise ordered by the Court, for further disposition in this case.

G.      Enter an order requiring Defendants, the Relief Defendant, and any third party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment interest;

H.      Enter an order directing the Defendants and Relief Defendant and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the investors whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

I.      Enter an order requiring Defendants to make restitution by making whole each and every pool participant whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

J.      Enter an order requiring Defendants to pay civil penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of (1) triple the monetary gain to Defendant for each violation of the Act or $130,000 for each violation occurring after October 23, 2004;

K.    Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

L.    Enter an Order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


Date:  February 19, 2009                          Respectfully submitted,


                                                  _____
                                                  Elizabeth M. Streit
                                                  Lead Trial Attorney
                                                  A.R.D.C. No. 06188119


                                                  _____
                                                  Brigitte Weyls
                                                  Trial Attorney
                                                  A.R.D.C. No. 6278696

                                                  _____
                                                  Rosemary Hollinger
                                                  Regional Counsel
                                                  A.R.D.C. No. 03123647

                                                  U.S. Commodity Futures Trading
                                                  Commission
                                                  525 West Monroe Street, Suite 1100
                                                  Chicago, Illinois 60661
                                                  (312) 596-0537 (Streit)
                                                  (312) 596-0547 (Weyls)
                                                  (312) 596-0560 (Hollinger)
                                                  (312) 596-0700 (office number)
                                                  (312) 596-0714 (facsimile)